[*General Term, January*, 1873.]

## John J. Hooker et al. *v.* J. S. De Palos et al.

Where lands were contracted to be conveyed for the purpose of promoting a gift enterprise, contrary to the statute, and $500 was paid on the land, and the balance was to be paid in one thousand tickets and out of the proceeds of the sales of other tickets; and it appearing that the lands were one of the prizes in the gift enterprise, and that many of the tickets in the enterprise, which had been nearly all put out for sale, had been sold, when the grantees of the land abandoned the scheme, called in all the tickets, and refunded to holders the money they had paid, except about $25, rescinded the contract, and brought suit to recover back the $500 paid on the lands:

*Held*, that inasmuch as one of the considerations and all the purposes of the

contract were illegal, the whole contract was void; and that having rescinded the contract, by which they prevented the illegal act from being done, the grantees had a right to recover back the money they had paid in part performance of an executory contract. They disaffirmed the contract, and did what they could to repair the wrong committed against the statute. The policy of the law is to grant the wrong-doer a *locus in penitentiœ*, for the avowed purpose of repressing the mischief and advancing the remedy.

That a claim that the grantors should keep the money paid, in consideration of their trouble and loss of opportunity to make a sale of the property, can not be considered.

It is not error to allow evidence to go to the jury which does not contradict or vary the contract, but puts the court in the situation of the parties at the time it was made, to enable them to arrive at the intention of the parties, and to prevent the plaintiffs from obtaining the fruits of an illegal bargain.

*J. & R. A. Johnston*, for plaintiffs in error.

*Lane* and *S. B. Carter*, for defendants in error.

HAGANS, J.    On the 25th of October, 1866, John J. Hooker and Col. A. E. Jones entered into a written contract to sell and convey to J. S. De Palos and E. H. C. Phillips, in consideration of $3,000 cash in hand, and $23,000, payable, $8,000 November 25, 1866, and $15,000 December 20, 1866, and 1,000 tickets in a gift enterprise (in which said lands were to constitute prizes), between said last dates, a tract of land in Spencer township, Hamilton county, Ohio, containing nearly eleven acres. It was also agreed that if De Palos & Phillips made default in payment, Hooker and Jones had the option to consider the contract at an end, and the money paid forfeited, and the right to dispose of the lands to any other person, as if the contract had never been made. De Palos & Phillips, in fact, paid to Hooker and Jones but $500 cash, and gave their note for $2,500, the remainder of the cash-payment, which note was never paid.

Immediately upon obtaining this contract, De Palos & Phillips projected a gift enterprise or lottery, in which this and other personal and real property appear as prizes.

The scheme shows that there were 10,031 gifts, of the alleged value of $75,000; 100,000 tickets, at one dollar each. They issued posters and handbills, specimens of which are in evidence, in which all the details are set forth, and they included a concert at Mozart Hall, in this city, on January 30, 1867, and the drawing was to occur on February 4th, thereafter. They promised to give the Newsboys' Home $5,000, and the balance of the net proceeds was to be divided among other charitable institutions. They also issued all the tickets, and put out some 20,000 to 30,000 of them for sale, and some of them were sold. It was an attractive enterprise, and inasmuch as the whole net proceeds were to be divided among deserving objects, it seems a pity that so benevolent a plan should have been disturbed. But the grand jury of this county thought it would be best to inquire into the matter, which, coming to the ears of De Palos & Phillips, they, with unaccountable haste seemingly, abandoned the enterprise, called in all the tickets, except twenty-five, which they tried to, but could not find, and returned all the money they had received for the sale of tickets, except the money for the twenty-five tickets named.

In the meantime, Jones and Hooker had frequently called on the defendants in error for the money contracted to be paid, but failed to get any. On November 21, 1866, Col. Jones addressed a letter to the board of trustees of the Orphan Asylum, in which he advises them of the benevolent purpose of De Palos & Phillips, to divide to the board part of the proceeds of the enterprise, which they desired the board to accept. He also stated that he had examined the plan, and certified that it was strictly honorable and would be honestly conducted, and also certified to the honorable character of Phillips. On the same day, Jones and Hooker addressed a letter to the German Protestant Orphan Asylum, to very much the same purport. As stated, however, the enterprise was abandoned shortly after these letters were written, perhaps in December, though Col. Jones puts it as late as February, 1867. Finally, the contract for the sale

of the land was rescinded, and this suit is brought to recover the $500 cash paid on its purchase.

De Palos testifies that, at the time the contract was executed, Hooker and Jones understood that he and Phillips were young men, with little or no means, and that Jones and Hooker were to get the money for payment on the contract, from, or as tickets were sold. This statement both Jones and Hooker deny, though the testimony and the circumstances strongly corroborate it. De Palos also states, that in the fall of 1866, or winter of 1867, he notified Jones that the enterprise was withdrawn, and demanded the repayment of the $500, and that both Jones and Hooker promised to repay, or to pay some, when they should effect a sale of the land, which they both deny. In the fall of 1867 they did effect a sale, at a considerable actual loss. De Palos also says Jones promoted and aided the enterprise, and there is testimony to that fact, though he denies it. There can be no doubt that both Hooker and Jones knew the purpose of the purchase—for the contract states it— that the money to pay for it was to come from the sale of tickets, and were advised of everything that transpired.

Col. Jones says, that between January 30, 1867, and February 20, 1867, he advised an abandonment of the enterprise, and his readiness to take the land back, which De Palos & Phillips refused, saying they were going to carry it on in Kentucky; and that afterward, when the parties were all together in Hooker's office, De Palos & Phillips relinquished all claim to the land, and in consideration of the trouble to which Jones and Hooker had been put, and the loss of chances of sale of the land, it was agreed that they should keep the $500. Mr. Hooker reiterates this statement. Col. Jones stated his willingness still to convey, or procure to be conveyed, the property according to the contract. Mr. Hooker says, in January and February, 1867, he and Jones insisted that the money should be paid or the contract given up, though they never agreed to abrogate it, but they finally gave it up in March or April, 1867, and

that De Palos & Phillips refused to comply with the contract.

The cause was tried at the June term, 1872, and the court, upon request, charged the jury, to which no exception was taken, and both plaintiffs and defendants asked special charges, all of which were given except two. The defendants in error asked the court to charge, that, "A contract executory in law is a contract yet to be executed or fulfilled, and, as applied to a lawful contract, it does not remain executory as to both, if time or any other ingredient stipulated for in the contract has not been complied with by either. The party seeking to avail himself of the executory nature of the contract, must show himself to have been ready to perform his part and be without fault. So where the contract is illegal, the party claiming the right to rescind and to recover back money paid thereon, must occupy the same relative position as the party seeking to enforce the legal executory contract. It ceases to remain executory as to him, if he has not performed his part. He has nothing on his part to rescind or put an end to." To the refusal to give this charge the plaintiffs in error excepted. The jury brought in a verdict for $665 for defendants in error, and the plaintiffs in error moved for a new trial, which was overruled, and judgment entered on the verdict, to all of which exceptions were taken. This was all done at the trial term.

The petition is framed in two aspects, viz: that when the contract was abrogated, the plaintiffs in error promised to repay the $500, and also, that when the plaintiffs in error sold the lands to other parties, they thereby disabled themselves from performing the contract with defendants in error, and so they were bound to repay. The answer was a simple denial of liability, to which a demurrer was interposed and sustained, and plaintiffs in error given leave to answer. To this there was an exception, and it is urged now, that the court should have searched the petition on this demurrer, and if there was no cause of action, the

cause should have been dismissed. Though the contract is set out in the petition, there is nothing on its face to inform the court of the precise nature of the transaction. The averments are sufficient, and we see no error here. The plaintiffs in error filed an amended answer, in which they *first* denied any promise to repay the $500, or that the contract was ever abrogated, and aver readiness and willingness to perform the contract, until the inability of the defendants in error to pay the purchase money become apparent, when, with their consent, they conveyed the lands to other parties, and the defendants in error agreed they should retain the $500. *Second.* That these lands were prizes in a gift enterprise and while the contract remained executory, it was not rescinded. To this another demurrer was interposed, and it was overruled and the cause dismissed. But the entry of the dismissal was afterward set aside and a reply filed, putting the whole case at issue. Some irregularity was alleged in this, but there is nothing in the record to show it.

The motion for a new trial and the errors alleged stand upon various grounds. Thus, that the verdict is against the evidence—against the law—against the charge of the court; that the court erred in admitting evidence relating to the understanding of the parties at the time of making the contract; that the court erred in the general charge, and refused to charge as asked by plaintiffs in error, and erred in giving the charge asked by the defendants in error, *to which the plaintiffs in error took no exception,* and erred in overruling the motion for a new trial. We need not notice a number of these grounds. Some of them are good by themselves, some are contradictory, and some need not have been stated at all. Is the verdict against the evidence? We do not think we are at liberty to disturb it for this reason. Did the court err in admitting evidence as to the understanding between the parties at the time the contract was made, as to the fact that the money to pay for the land was to come from the sale of tickets? We think not.

This evidence does not contradict or vary the contract. It is always competent to put the court in the place of the parties at the time, by proving the circumstances under which it was made, to enable them to arrive at the intention of the parties. *Hildebrand* v. *Fogle*, 20 Ohio, 147. Indeed, any fact which might destroy the plaintiff's right to recover, and, if it be admitted that the contract is unlawful, to prevent them from obtaining the fruits of an illegal bargain, is competent evidence. *Russell* v. *De Grand*, 15 Mass. 35. In this view, the admission of the testimony did the plaintiffs in error no harm. They certainly ought not to complain of it, for it was in their favor.

Did the court err in the general charge? Was the verdict against the law? Whether it was against the charge of the court, does not seem material to inquire. The question is, as the record presents it, is the verdict against the law? And this we may properly inquire into, though no exception by the plaintiff in error was taken to the general charge, or to any of the special charges, except as to one, which we shall notice presently. It is undoubtedly the law, where the evidence and all is before us, that if the error of the law, occurring at the trial, be such as to make the verdict contrary to law, a new trial should be granted, though no exception was taken to the ruling of the court. *Kline & Berry* v. *Wynne*, etc., 10 Ohio St. 223 ; *Mowry* v. *Kirk & Cheever*, 10 Ohio St. 375.

It is admitted by all the parties that this was an illegal contract, contrary to the laws of Ohio (1 S. & C. 433, sec. 43), and it is admitted, indeed it could not be well denied, from the evidence, that the parties were all equally implicated in this scheme. All that was done, including the contract, was illegal and void. The contract was indivisible, both as to its purposes and consideration; and it can not be said that part of it was good and part of it was bad, and that we should sustain that which is good and hold void that which is bad. If one of two considerations be unlawful, the contract is void. We do not think that if a

court had been called on to specifically enforce this contract, it would have done so in whole or in part. The whole contract was unlawful, and the guilty purpose clearly appears on the face of the contract; and all the parties were equally criminal, though not equally liable to prosecution under the statute. *Widoc* v. *Webb*, 10 Ohio St. 431; *Moses* v. *Katzenberger, etc.*, 1 Handy, 46.

Now, if the contract was executed, the court would leave the parties where they found them, and the action should be dismissed. If, however, the contract is to be regarded as executory merely, then, at any time before the unlawful act is done, he who has advanced money in consideration of an unlawful contract, may rescind it, and prevent the thing from being done, and recover back his money. "It would seem obvious," says Mr. Parsons in his work on Contracts, 2 Parsons on Cont. 747, "that if he delays rescinding until his rescission is inoperative, and the thing will still be done, although the contract, at the time of the rescission, was in form executory, it should come under the same rule as an executed contract for unlawful purposes." In such a case the law refuses to interfere, unless the case shows one doing and the other suffering a wrong, when the sufferer will be entitled to a remedy, but not the wrong-doer.

Let us apply these principles to this case. The first cause of action set out in the petition seeks a recovery on the strength of a promise to pay back this $500 in consideration of the rescission of an illegal contract. This proceeds on the idea of an affirmance of a contract which was *malum prohibitum;* for if the contract be good, the promise to repay on rescission was founded on a sufficient consideration. Manifestly there could be no recovery on that ground. But the second cause of action is sufficient. It is brought on a disaffirmance of the contract. The law, which is always merciful, gives the wrong-doer in this class of cases a *locus penitentiæ.* It is not our province to scrutinize the motives of the party; it is enough that he disaffirms the contracts, and either undoes such portions of the

wrong as he has committed in the prosecution of the unlawful purpose, or does what he can to repair the injury done, before the contract is consummated. In this case the rescission was operative, except as to twenty-five tickets; but the enterprise was stopped. It is said, however, that this contract was executed. But we think not; something was yet to be done by both parties; a deed was to be made, and a receipt of the wages of an illegal scheme on the one part, and the prosecution and fulfillment of that scheme on the other. The case of *Brown* v. *Timmany,* 20 Ohio, 81, is decisive of the principle involved in this case; and though in other respects that case was subsequently overruled (see 2 Ohio St. 604, and 4 Ohio St. 566), the principle of the decision has not been touched. There an agreement was made on Sunday, whereby the plaintiff was to deliver the defendant a yoke of oxen in exchange for a colt of plaintiff's and five dollars in money. The money was paid down when the contract was made, and the defendant was to bring the oxen the next day and take away the colt. If he failed to do so, he was to forfeit and pay to plaintiff one dollar. The defendant wholly failed to fulfill the contract, and this action was brought to recover back the money. The court say this was an illegal contract and money advanced in part performance of it, and if either party sees fit to put an end to its further fulfillment, the amount paid may be recovered back. In this case, as in that, the contract was not wholly executed. The plaintiffs in error admit that the contract is illegal and must repudiate it, and indeed have done so. How, then, can they withhold the money that has been advanced on the faith of the agreement? We do not think the alleged agreement that defendants in error were to let the plaintiffs in error keep the money, in consideration of their trouble and loss of opportunities for sale, is sufficient. The plaintiffs in error brought that very state of things on themselves, and they ought not to complain, and do not make the claim with good grace. It is in the nature of a

counter-claim, which the court will not countenance. But it is said, suppose 99,999 tickets had been sold, and the defendants in error then chose to repudiate the contract, having paid the plaintiffs in error a large part of the purchase money, what then? It is said if the principle stated is good, it should hold good under this state of fact. It may be enough to say that we are not now called on to determine this state of case. The *locus penitentiæ* is, by our statute on gaming, put far beyond such a case as that at bar. Even after money has been lost at gaming and the money paid over, yet it may be recovered back by the loser. And parties to illegal bets may recover their respective deposits after the contingency has happened on which the money was staked, and after the same has been paid over. An examination of cases will show that the policy of the law in nearly every state in the Union is to enlarge the *locus penitentiæ* for the avowed purpose of repressing the mischief and advancing the remedy. See *McAllister* v. *Hoffman*, 16 S. & R. 147; *Barrett* v. *Neill*, Wright, 472.

As was well said by Judge Wood, in the case last cited, which was that of a bet on a contemplated, but finally abandoned horse-race, " it seems to us such agreements ought all to be abandoned, not kept, and it would be iniquitous to allow a depositary, under such circumstances, to plunder the retracting and repenting parties." Here the parties undid all the mischief they had done, or honestly tried to do so, and put themselves in a position to demand the money back.

Though it may be true the court erred in its general charge, which we have not thought it necessary to consider, the verdict is right, and supported by the evidence. It is obvious that the charge asked by the plaintiffs in error, and refused by the court, if at all intelligible, was properly refused. At most, it contains abstract propositions, which the court was not bound to give.

On the whole case, we think the verdict is right and in accordance with the law of this case, and the judgment

will be affirmed; but on the condition that the defendants in error remit the twenty-five dollars for tickets sold and money not refunded. We are not willing that they should keep that too, but that they should simply be placed *in statu quo.*

A great many authorities were cited to us, all of which we have examined; but we have been unable to see that they are opposed to the principles we have stated as the law in this state.

Judgment affirmed.